Republic Bag v. Beasley and Valentine v. MacLeanan, and we will take up the San Diego Comic Convention v. Dan Farr Productions case. The San Diego Comic Convention v. Beasley and Valentine v. Beasleyan, and we will take Beasley and Valentine v. Beasley,  Second are decided as a matter of law legal issues. And here we have the undisputed facts that are clear. If the court grants or denies summary judgment, it'll still be de novo review for this court to decide whether that was proper. And here, uh, the summary judgment. Uh, you know, all the evidence is before the court. We've laid out all the facts in our favor. San Diego's laid out all the facts that they believe support their case. Um, in the It's this court can determine that there's no tribal issue of fact there, especially since San Diego didn't present anything. I guess the problem that I'm having is that you're saying when, when the San Diego Comic Convention adopted the mark, it was a generic mark, but you agree that it became a descriptive mark when it was registered. And at the time it became incontestable, acquired that status. And at the time of the jury verdict, do you agree with all of those three points? I do not agree with those points because which point do you disagree with? Uh, if we were allowed to prove that the mark was generic when it was adopted, that would mean as a matter of law that it remains generic today. So, well, but not, not really. I mean, I think McCarthy on trademarks and they talk about becoming non generic, becoming descriptive. I mean, the line between descriptive and generic is kind of, you know, I think it's a little bit of a, I guess it's described as thin. And in this case, when the mark was registered, it, it was originally rejected by the PTO as, um, not being distinctive enough, but by being merely descriptive. And then the San Diego Comic-Con put in an affidavit and demonstrating acquired secondary meaning. I understand you challenged that affidavit, but the PTO accepted it. Uh, Rana, the, the PTO is almost required to accept that affi-, you know, once the affidavit's in the proper form and it declares to, you know, this use was substantially exclusive, that's prima facie evidence that, uh, that the mark was distinctive. So it's not the, you know, the, that, the PTO isn't performing a searching inquiry to determine the truthfulness of that affidavit. And we believe, we've demonstrated in our brief that, in fact, the, uh, the attestations of, um, exclusive use that were relied on by the PTO weren't true in the sense that the PTO would have understood them. Exclusive use supposed to mean, according to the PTO, that no one else was using it. And, uh, San Diego's executive never would have signed the declaration if she'd known that that's how it would be interpreted, that that's how it was interpreted. Uh, but, but going back to your point, um, the, the theory that was tried to the jury, was basically what does, what is the primary significance of Comic-Con today? So, uh, I don't think it's correct to read into the jury's finding anything about the primary significance of Comic-Con in 1970. So the question is, if we can prove, uh, what the primary significance of Comic-Con in 1970 was to potential attendees, does that make a difference? Uh, that's the generic one adopted theory, and we've presented cases that shows it does make a difference. Uh, I think the Harley-Davidson case is probably the clearest example of that. Harley-Davidson, uh, had a registered mark in a hog, uh, and the court said it doesn't matter whether now people associate Harley-Davidson and hogs together. What matters, uh, at least under the theory of that case, was, uh, what Harley, or what hog meant at the time Harley-Davidson adopted the case. And we cited that case in our opening and answering brief, or opening and reply brief, and, uh, uh, I don't believe, uh, San Diego even addressed it at all, so I, I would stress the importance of that Harley-Davidson case. Uh, what Harley, the, the method of proof of genericness acknowledged in Harley-Davidson is the same as what we're trying to do in this case. Uh, for whatever reason, the district court didn't buy it, thought maybe it was a Second Circuit case, so I'm not going to give it any credence. But if you look at the Ninth Circuit and Second Circuit case law on genericness, it really comes from the same origin. The Ninth Circuit case of Surgeon Center cites the same Second Circuit cases that, uh, Harley-Davidson relied on to apply this generic when adopted theory. Um, another, uh, example, I think a clear example of this application, but there is the, the Miller case, Miller v. Falstaff, out of the First Circuit. And the court said, uh, that because light, for beer, had already been, uh, determined to be generic ten years ago, it doesn't matter that the meaning of light might have changed in the last ten years, so that now everyone associates light with Miller. Uh, the court still said, because, uh, it had that generic meaning at one point, it can never achieve trademark significance. Uh, and I submit the only way to give meaning to this court's rule that a generic mark cannot become a trademark under any circumstances, uh, is to have a generic meaning. Even if it requires secondary meaning. That, that statement appears over and over in the cases. So how do you give that meaning in the district court? And the way to give that meaning in the district court is to allow us to prove what the term meant in 1970 when San Diego adopted the term. If you look at the evidence we presented on that, I think, uh, all reasonable fact finders would, um, would adopt one conclusion, that the term Comic-Con in 1970 meant a comic convention. San Diego presents no evidence to the contrary. I think the difficulty, uh, difficult aspect of this case is incontestability. That I, I accept what you say in the context of all these other cases, but really very few of them deal with incontestability, uh, in the context of generic, uh, epinicious. So do you have a case that actually says that in the context of incontestability? The, uh, you know, the Solid 21 versus Hublot case, uh, the mark was incontestable there. Now the district, that's a district court decision, and it didn't, um, mention incontestability as relevant. So you can take that as an indication that it didn't view it as relevant, but it didn't directly engage with the statute. Uh, there, there is a. And I agree you would be the first court to determine the, um, I guess, interaction between this generic one adopted theory and incontestability, but I think the answer is clear. Uh, there, there are a couple of angles to take on this. One is that, uh, the, the statutory hook that San Diego is relying on, this meaning of the word is, uh, is weak. It sometimes is, means, was, future, everything, and it just depends on context. So let's look at the context of this incontestability statute. The, the legislature was concerned, uh, when it was codifying trademark law in, in the 1940s that putting in these incontestability provisions would somehow give trademark owners more rights than they had a common law to protect generic terms. And there were, uh, uh, people objecting that that would be the effect of this law. Uh, the response to those objections was to, uh, insure, uh, to, to reassure them, hey, this, the point of this statute isn't to change the common law genericness defense. And then the statute was, uh, there, the bill was amended to put in the section that we're relying on, 1054, Section 4, which says, the knowing and testable right shall be acquired, uh, in a term which is the generic name for a good or service. Um, so the whole intent of that provision, knowing and testable right shall be acquired in generic name, is to preserve that common law defense of genericness. So we can show that our, uh, uh, theory was recognized in the common law. I think that the intent of that statute was to preserve it. But wouldn't Congress have made it explicit as to one of the listed defenses, if that's what it intended? Well, I think Congress wasn't intending to distinguish between different types of genericness theories. Uh, I mean, we, we've kind of, um, put a label on this theory. Uh, I, I don't want to be confusing by putting on a separate label. The, the theory is genericness, and it's just a way of proving genericness. So, uh, when Congress said... But, but, but, to, we've got an incontestable mark here, right? Well, it's... And, and incontestable, Congress expressly put, set forth the grounds on which an incontestable mark could be challenged, right? And it didn't include genericness. Well, it, Congress actually said no incontestable right shall be acquired in a mark that is generic. Right. So the marks here were not... And reading that, shall be acquired, that, I mean, the ordinary use of the word is in that context would be at the time it acquires incontestable status. So, Your Honor, even under that reading, we prevail. Because, uh, a mark that is generic when it is adopted is still generic at the time an incontestable right would otherwise be acquired. And that's the way to give meaning to the statement, uh, that a, a generic mark cannot become a protectable trademark under any circumstances. Um, so if you look at the Grotten, uh, the Harley-Davidson case, they look at evidence that the mark was generic to conclude, as a legal conclusion, that the mark is generic at the time of the decision. And we look at the Miller case, they say it the same way. So the, the legal question answered by these cases is, is the mark generic? And the way that they determine a mark is generic today at the time of the decision is that it had a generic meaning in the past. But a mark can become non-generic over time, right? Uh, not according to Surger Center's or the Filipino Yellow Pages case. Um, so, no, a generic mark stays generic even if there's some kind of showing of secondary meaning. But, but yet, you're not contesting the jury's finding in this case that the mark was not generic? Uh, Your Honor, the, the jury's finding in this case did not consider the meaning of the term as of 1970. So if, and we weren't allowed to put on any evidence about what happened before 1970. So the, the question, if the generic when adopted theory were in the case, there would be different evidence and there would be different jury instructions. So the question answered by the jury, um, you know, is this mark generic as measured by... of generic at adoption? I'm saying that the jury's verdict is irrelevant? Yeah, that's what you're, that's what you're saying. Because if we adopt your theory, the whole thing has to be retried, right? Well, I'm saying that the jury's validity are, you know, the jury rejected one theory of genericness, the generic side theory. It didn't address the generic when adopted theory because that theory was removed, uh, through the summary judgment procedure. All right. Why don't you reserve the rest of your time? Let's hear from the other side. Thank you, Your Honor. Thank you. Missy? Kevin Fong, representing Appley San Diego Comic Convention. May it please the court. Let me begin with the issue of genericness. The evidence at trial showed that 82% of those surveyed understood Comic-Con to be a brand name. The jury was instructed on the issue of genericness and determined that all three marks are valid and protectable. And the district court upheld that determination. But defendants asked for one more chance, this time to show that Comic-Con was generic when San Diego Comic Convention first used the mark in 1970. There is no statutory basis for such a challenge to an incontestable mark. If we disagree with you and find that they could have asserted a generic, uh, initial challenge to Comic-Con when it was first utilized in 1970, then what would happen to this case? I think it's still affirmed because defendant summary judgment evidence failed to show that the Comic-Con mark was generic in 1970. There was no evidence that the primary significance of the mark to the relevant public in 1970 was as a generic, uh, term. There were dictionaries. But were they precluded? Weren't they precluded from presenting such evidence based on the summary judgment ruling? Oh, they did, in fact, introduce a lot of that evidence anyway, even though it wasn't relevant in light of the summary judgment. So your argument is that even if we find that the district court erred in legally finding that such a defense was not available, that evidence sort of came in and the jury got to consider it anyway? Not exactly. The summary judgment evidence itself was insufficient to force a trial on the genericness at the time of adoption theory, even if there is such a theory. And as I'll explain, there really isn't. It's statutorily barred by incontestability. So that there's no trial issue. Correct. Then I'll ask you the same question that I asked counsel. If we determine that that's wrong, we normally don't, in the appellate court, engage in the facts to figure out whether there's a trial issue there. So should we send it back for the district court to engage in that analysis in the first instance? In other words, if we, and I'm not suggesting that that's how it's going to turn out, but if we decide that that defense should have been available, then isn't that the district court to grapple with it and determine whether there's still a trial issue there? And to decide whether it's necessary to unravel this trial. If you determine that the defense should be available and that the summary judgment evidence presented by defendants was sufficient to create a trialable issue of fact, then you're right. Then it's to trial on the issue of genericness in 1970. I don't know how you ever try an issue like that. It's obviously very difficult to do a survey based on what people thought in 1970. It's obviously very difficult to get direct testimony from people who say, here is what I understood the mark to mean in 1970. And that difficulty is precisely why Congress did not provide for such a defense in 1065-4. So 1065, I think, is dispositive and makes it unnecessary to reach this issue of what's the proper disposition if there were a reversal and remand. There shouldn't be a reversal and remand. Because Congress has provided for incontestability in 1065 after five years of use of a registered mark. It's essentially a way to give quiet title to mark holders. And the Supreme Court's decision in Park and Fly addresses this specifically. It says that as a backdrop, trademarks should receive the greatest protection possible. But more specifically on page 198 of Park and Fly, quote, the incontestability provisions provide a means for the registrant to quiet title in the ownership of his marks. So in other words, 1065 encourages producers to cultivate goodwill associated with a particular mark. And it does so by providing this quiet title mechanism. Here, defendants' generic at-the-time-of-adoption theory would blow up that quiet title feature in the statute. Because defendants essentially argue that the primary significance of Comic-Con 50 years ago can be relitigated before a jury. Congress never intended such an end run around the quiet title provision of 1065. Now, of course, 1065 does have exceptions. Congress provided the general exception that there's no incontestable right if the mark is generic at the time the registrant files its affidavit under Section 1065. Now, of course, I'm paraphrasing a bit, but I won't even try to improve on the statement and analysis of language that's in our opening brief. Fair to say, though, that it's a narrow mousehole exception. You may remember that some Supreme Court justices and some Ninth Circuit judges are fond of using the phrase, Congress doesn't hide elephants in mouseholes. Well, that applies exactly here. There's no provision in 1065 for challenging a mark as generic at the time of adoption. That would be an extremely broad elephant that would open the door to turning every trial into a reexamination of the issue of genericness from the perspective of 30, 40, 50, 60, 70 years ago when the mark was first adopted. Now, defendants mentioned legislative history. Here's the interesting thing. And it's addressed a bit in Park and Fly, which does touch on the legislative history. The particular provision at issue here, 1065 paragraph 4, was introduced in 1946, way back, in a joint House-Senate conference. So it wasn't in either the original House bill. It wasn't in the original Senate bill. It was the product of a joint House-Senate conference. That's in 1946. The snippets of legislative history that defendants rely upon are from two years prior to that, where there are a few statements by individual senators, which, by my reading, are addressing genericide, not generic at the time of adoption. So the legislation — So you don't disagree that genericide is a defense? Oh, genericide is a defense because 1065 refers back to 1064 paragraph 3, which is essentially the genericide provision. So, yes, genericide is clearly a valid defense to an incontestable trademark. And that was what was tried before the jury. So they did have their day in court on 1064.3 genericide. Turning to the issue of unclean hands, the district court found there was no intent to deceive, and that was not an abuse of discretion. Fundamentally, defendants are wrong in assuming there is a duty to disclose, rather, all junior users. The controlling case is the Federal Circuit decision in L.D. Kichler, a 1999 case that's cited on page 50 of our brief. In Kichler, the Federal Circuit makes clear that there is no duty to disclose use by others that is inconsequential or infringing. And that's specifically in the context of what the trademark lawyers call a 2F affidavit, which is what we have at issue here. Here, there's no clear and convincing evidence that Ms. Desmond or Mr. Hahn knew there was a duty to disclose of any other conventions in 2006. Let me point you to three specific factual items. First, the Chicago Convention. The Chicago Convention was not a consequential use. It was an inconsequential use because the testimony at trial showed that Wizard World did not use the Comic-Con trademark from the late 1990s to 2010. Instead, it used Wizard World Chicago. So imagine you're in the shoes of Ms. Desmond or Mr. Hahn in 2006, and you know, perhaps, that there's a Chicago Convention called Wizard World Chicago. That's an inconsequential use. It's more than irrelevant. It's off the map. New York. The use in New York was inconsequential, and it was infringing. While currently sitting here in 2020, it may be one of the largest conventions, the first New York comic convention was not held until 2006. And then it was viewed by Mr. Hahn as an infringing use. That's at 1706 to 1709 of the excerpts of record. By the way, I'm sorry, let me jump back to Wizard World Chicago. For Wizard World Chicago, the pertinent portion of the record is the November 29th morning transcript of the trial, which also appears electronically in the court's docket 372 of the district court docket. And on page 75 to 76 of that November 29th transcript, there's the whole explanation of Wizard World Chicago. And finally, defendants argue in their reply that there were 24 comic conventions that Ms. Desmond or Mr. Hahn knew about in 2006. But there's no clear and convincing evidence that any of those conventions were still operating at the time of the affidavit in 2006, or even that they were actually held in 1996. The trail ends in 1996 with a bunch of listings that were compiled into an exhibit on 1380. So with that, there was no clear and convincing evidence of an intent to deceive. And layered on top of it, you have the appellate review. There was no abuse of discretion by the district court. So with that, unless the court has any questions, I'll submit on the briefs. All right. Thank you very much, counsel. Thank you. Runners, going back to my colleague's point about the legislative intent behind Section 1065, I agree that Congress would not try to hide an elephant, and I submit that if you look at 1065 paragraph 4, it does not make any distinction between types of genericness. That just might not have been on Congress's mind. If Congress wanted to allow one type of genericness defense but preclude other types of genericness defenses, there could have been a lot clearer way to do it. Congress just said no indetestible right shall be acquired in generic terms. And what we have shown through the generic when adopted theory is that there is a way to prove that a mark is generic based on the understanding of that term when the mark was adopted. You know, that method of proof would not blow up longstanding issues. And here we have an issue of, yes, we are looking back many, many years. What do you do with the district court's alternative holding that even if such a theory existed, you did not introduce enough evidence to withstand summary judgment? Your Honor, we brief that directly. We have the dictionary definitions of comic and con. We have media usage of comic con in the 1960s and 70s through these fanzines and then in the New Yorker. We have other competitors using comic con to name their own comic conventions in the 1960s and 1970s. And we have San Diego's use of comic con only with the limiting term San Diego and never using it alone. And all of that taken together shows that a person, a potential attendee in the 60s or 70s, would have understood comic con to mean a comic convention, not necessarily San Diego's comic convention. In the lead up to the 1964 convention, people were talking about we need a comic con, talking about some kind of international comic con, a traveling comic con. And the district court, I think, was colored by its view that the generic when adopted theory didn't exist and didn't really give a fair shake to the evidence that we did present. I realize I'm out of time, but if the court wants to talk about the fees aspect, if there's any, I know that was about half the briefing. The district court basically sanctioned counsel for zealous advocacy that is not exceptional, including asserting some of the things that this court in its mandamus ruling said were okay. So at the very least, the fees award should be vacated. That said, I think the generic when adopted theory does exist, and the reason why we're looking back 50 years in this case is because San Diego was using the term, let's say, for 36 years. First, they waited 25 years before applying for the MARC Comic Space Con. They abandoned that application. It said Registered Comic Con International. Ten years later in 2005, 35 years after their purported first use, only then did they register a comic hyphen con. And you can look into that and show what they actually believed was a valid trademark at that point. So to the extent we're looking back far in time, that's the unique facts of this case where San Diego has allowed hundreds of comic cons to spring up, waiting 35 years before registering a term. So we won't run into these issues in other cases where you're looking backwards so far. And to the extent there is an issue looking backwards, well, it's the defendants that would bear the burden of proof. So that would give the proponent of a MARC some protection. So to the extent there's any difficulty in getting evidence about what the term meant back when a term was adopted a long time ago, well, that's the defense's problem. So there's no issue with recognizing this generic when adopted theory here. It won't blow up anything. All right. Thank you very much, Counsel. Thank you, Your Honor. San Diego Comic Convention v. Danfarr Productions will be submitted.
judges: Thomas, Wardlaw, Nguyen